# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BEVERLY HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 16-416 |
| | ) | |
| v. | ) | Judge Nora Barry Fischer |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| DOLLAR GENERAL | ) | |
| CORPORATION, WOODROW DAVIS, | ) | ECF No. 19 |
| and PAMELA BIEGEL, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

**I.    RECOMMENDATION**

It is respectfully recommended that the Motion to Dismiss filed by Defendants Dollar General Corporation and Pamela Biegel (ECF No. 19) be granted in part and denied in part. It should be granted as it relates to the PHRA claim, and the negligent infliction of emotional distress claim. It should be denied in all other respects.

**II.    REPORT**

Presently before the court is a motion to dismiss filed by Defendants Dollar General Corporation ("Dollar General") and Pamela Biegel ("Biegel") (collectively "moving Defendants"). The Plaintiff, Beverly Harris, ("Plaintiff" or "Harris") files this action pursuant to 42 U.S.C. §§ 1981 and 1982. Plaintiff also includes various state law claims. The claims arise from interactions between Plaintiff, a black individual; Biegel, a white individual and an employee of Dollar General; and former employee Defendant Woodrow Davis ("Davis"), also a white individual, while Plaintiff was shopping at the Monroeville location ("Store 08740") of Dollar General.

A. FACTS

On March 13, 2016, Defendant Davis[1] and moving Defendant Biegel, manager at moving Defendant Dollar General, were working at Store 08740 when Plaintiff was shopping there. (Second Amended Complaint, ECF No. 15 ¶¶ 7, 9, 10.) Plaintiff gathered her items for purchase and gave those items to the cashier who scanned the items and informed Plaintiff of the price to be paid. (ECF No. 15 ¶¶ 11-12.) Plaintiff gave the cashier her Electronic Benefits Transfer card ("EBT") to purchase a number of the food items, but the EBT card failed to scan. (ECF No. 15 ¶¶ 13-14.) Defendant Davis approached the register to assist the cashier and instructed Plaintiff at least three times "in a condescending tone to 'swipe the card and press the food stamp option.'" (ECF No. 15 ¶¶ 15-16.) Each time, the EBT card failed to scan. (ECF No. 15 ¶ 17.)

The original cashier then called the manager, Defendant Biegel, to assist the transaction. (ECF No. 15 ¶ 18.) Defendant Biegel informed the original cashier that Store 08740 does not accept food stamps, and directed her attention to the sign posted at the front of the store. (ECF No. 15 ¶ 19.) Manager Biegel asked Davis why he "misinformed [Plaintiff] about the policy." (ECF No. 15 ¶ 20.) Davis laughed at Plaintiff and began talking to a white customer, making fun of the fact that Plaintiff was an EBT user. (ECF No. 15 ¶ 21.) Moving Defendant Biegel, without knowledge that Plaintiff had cash to pay for the items without EBT, then began removing food items from the register area. (ECF No. 15 ¶ 22.) Defendant Davis loudly proclaimed: "I can't wait til [sic] Trump is President, see if [Plaintiff's] ass gets any food stamps then." (ECF No. 15 ¶ 23.)

By this time, the line to check out had grown considerably, and a number of customers were privy to Davis' comment, in addition to Biegel. (ECF No. 15 ¶ 24.) Plaintiff felt

---

[1] Defendant Woodrow Davis is not a moving defendant on the motion to dismiss presently before the Court.

embarrassed and racially harassed by Davis, and made this fact known to him and Biegel. (ECF No. 15 ¶ 25.) In response, Davis said: "You know what stupid bitch, I fucking work, and I can't even get food stamps." (ECF No. 15 ¶ 26.) Defendant Davis then asked Harris: "What the fuck do you do all day? Nothing, that's how y'all [sic] do is get food stamps." (ECF No. 15 ¶ 27.) Harris, though thoroughly embarrassed, relayed to Davis that she does indeed work, but nonetheless she receives EBT benefits. (ECF No. 15 ¶ 28.) Davis replied: "Yeah we know. Now you got me fucking pissed off bitch." (ECF No. 15 ¶ 29.) After this statement, Biegel started to walk away. (ECF No. 15 ¶ 30.) Plaintiff alleges that Davis' increasingly erratic and hostile behavior prompted a customer to summon police officers. Biegel attempted to dissuade the customer from calling the police. (ECF No. 15 ¶ 31.) Biegel instructed Plaintiff to calm down. (ECF No. 15 ¶ 32.) Plaintiff accused Davis of being a racist, and accused Biegel of standing by and allowing his racist tirades. (ECF No. 15 ¶ 33.) Defendant Davis approached Plaintiff and slammed his hands on the check-out counter, pointed his finger to within an inch of Harris' face and screamed: "I am sick of [Plaintiff] using the system, that's all y'all [sic] people do." (ECF No. 15 ¶ 34.) Plaintiff, embarrassed, humiliated, and angry, forcefully instructed Davis to immediately stop pointing to and yelling at her, and that she was pregnant. (ECF No. 15 ¶ 35.)

While away from the register waiting for the police to arrive, Defendant Davis assisted a white customer with purchases and acted in a completely professional manner. (ECF No. 15 ¶ 36.) Plaintiff proclaimed: "Damn you treated that white dude real good, oh huh, yeah." (ECF No. 15 ¶ 37.) Defendant Davis turned around to face Plaintiff, laughed at her, and said, "You bet I did." (ECF No. 15 ¶ 38.) Defendant Davis told Plaintiff to "look around, this is a mostly white area." (ECF No. 15 ¶ 39.) Plaintiff then began to cry and Defendant Davis continued to laugh.

(ECF No. 15 ¶ 40.) Defendant Manager Biegel witnessed the entire interaction and never attempted to intervene. (ECF No. 15 ¶ 41.)

An officer responded to the store, but Defendants Davis and Biegel refused to speak to him. Since Plaintiff was not physically injured, no arrest was made nor was a report filed. (ECF No. 15 ¶ 42.) Biegel came outside and told Plaintiff that "Woody is not a racist" and that "this is a mostly white area." The Second Amended Complaint suggests that these statements by Biegel were meant by Biegel as an apology. (ECF No. 15 ¶ 43.)

Plaintiff demanded the information necessary to file a report with Defendant General Dollar's corporate offices. (ECF No. 15 ¶ 44.) Biegel begged Plaintiff to not reference Biegel's complete failure to handle the situation, because she "didn't want to get in trouble." (ECF No. 15 ¶ 45.) Plaintiff then left and went to another store to purchase her items. (ECF No. 15 ¶ 46.)

On March 14, 2016, Plaintiff filed a report with Dollar General Corporate offices. (ECF No. 15 ¶ 47.) On March 15, 2016, a Company District Manager called Plaintiff and assured her that he would "look into" the situation. (ECF No. 15 ¶ 48.) On March 25, 2016, that same District Manager sent Plaintiff a text message asking if she would accept an apology from Davis, so that Davis could return to work. (ECF No. 15 ¶ 49.) Plaintiff did not respond to the text message and approximately one hour later, the District Manager called Plaintiff and asked if she would entertain and accept an apology from Davis, so that Davis could return to work. (ECF No. 15 ¶ 50.) Plaintiff agreed to allow Davis to call her and apologize, but he had not called as of the filing of the initial complaint in this civil action. (ECF No. 15 ¶ 51.)

Plaintiff avers that as a result of these events, she has been experiencing some complications with her pregnancy, due in part to the stress and depression because of Defendants Davis and Biegel. (ECF No. 15 ¶ 52.) In addition, she has made two trips to different

4

emergency rooms, and has been admitted to the hospital. (ECF No. 15 ¶ 53.) She has been unable to return to work since the incident, and has been placed on bed-rest. (ECF No. 15 ¶ 54.)

Plaintiff seeks compensatory damages in the amount of $250,000.00, punitive damages in the amount of $7,000,000.00, and lost wages.

B. LEGAL STANDARD

Recently, the United States Court of Appeals for the Third Circuit aptly summarized the standard to be applied in deciding motions to dismiss filed pursuant to Rule 12(b)(6):

> Under the "notice pleading" standard embodied in Rule 8 of the Federal Rules of Civil Procedure, a plaintiff must come forward with "a short and plain statement of the claim showing that the pleader is entitled to relief." As explicated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), a claimant must state a "plausible" claim for relief, and "[a] claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Although "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), a plaintiff "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Fowler*, 578 F.3d at 213 (quotation marks and citations omitted); *see also Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 117–18 (3d Cir. 2013).

*Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014).

In support of their Motion to Dismiss, Defendants argue the following: 1) Plaintiff has failed to allege that Defendants prevented her from making a purchase; 2) the remarks alleged in the Second Amended Complaint do not show racial animus; 3) Plaintiff failed to exhaust her administrative remedies with regard to her claim pursuant to the Pennsylvania Human Relations Act; and 4) Plaintiff's tort claims fail because she has failed to alleged the requisite elements for intentional and negligent infliction of emotional distress. Plaintiff responds that she has

5

sufficiently pled her §§ 1981 and 1982 claims and her tort claims. Plaintiff does concede, however, her claim pursuant to the Pennsylvania Human Relations Act.

C. ANALYSIS

SECTIONS 1981 AND 1982

Plaintiff asserts liability against Defendants under 42 U.S.C. § 1981, which provides as follows:

> 1981. Equal rights under the law
>
> (a) Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c) Protection against impairment
>
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981. A claim under section 1981 is restricted by its language to discrimination based on race or color. *Springer v. Seaman*, 821 F.2d 871 (1st Cir. 1987) (racial animus is necessary element of claim under § 1981). Accordingly, to state a claim under 42 U.S.C. § 1981, a plaintiff is required to plead facts demonstrating that the plaintiff is member of a racial minority, that there was intent to discriminate on the basis of race by the defendant, and that

discrimination concerned one or more of the activities enumerated in the statute. *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993); *Imagineering, Inc. v. Kiewit Pac. Co*, 976 F.2d 1303, 1313 (9th Cir. 1992) (under § 1981, plaintiff must allege facts that would support an inference that defendant intentionally and purposefully discriminated against him); *Hood v. New Jersey Dep't of Civil Serv.*, 680 F.2d 955, 959 (3d Cir. 1982).

Next, Plaintiff asserts liability under § 1982, which establishes the property rights of citizens, and provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. "To establish a cognizable claim under § 1982, a plaintiff 'must allege with specificity facts sufficient to show . . . (1) the defendant's racial animus; (2) intentional discrimination; and (3) that the defendant deprived plaintiff of his [property] rights because of race.'" *Crane v. Cumberland Cnty., Pa.*, 64 F. App'x 838, 841 (3d Cir. 2003) (quoting *Brown v. Philip Morris, Inc*., 250 F.3d 789, 797 (3d Cir.2001)).

"Like § 1981, § 1982 is a Reconstruction statute enacted to effectuate the aims of the Thirteenth and Fourteenth Amendments to the Constitution. Because of the historic interrelationship between the two statutes, courts have consistently construed them together." *Brown*, 250 F.3d at 797 (citing *Saunders v. Gen. Servs. Corp.*, 659 F. Supp. 1042, 1063 (E.D. Va. 1987)) (other citations omitted).

First, the moving Defendants argue that Plaintiff's § 1981 and § 1982 claims fail because Plaintiff does not allege that Dollar General or Biegel prevented her from making a purchase. Taking all of Plaintiff's allegations as true and affording her every favorable inference as required at the motion to dismiss stage, the Plaintiff has specifically alleged that after the EBT card failed to scan, Defendant Biegel, "without knowledge that Plaintiff had cash to pay for the

7

items without EBT, then began removing food items from the register area." (ECF No. 15 ¶ 22.) Clearly, Plaintiff has sufficiently alleged that she was prevented from making a purchase.

Second, the moving Defendants argue that Plaintiff's claims must fail because the alleged remarks do not show racial animus. Again, taking all of Plaintiff's allegations as true and affording her every favorable inference, the Second Amended Complaint is peppered with the following averments that, when read together, reflect racial animus:

>    1. Manager Biegel asked Davis why he "misinformed [Plaintiff] about the [food stamp] policy." (ECF No. 15 ¶ 20.) Davis laughed at Plaintiff and began talking to a white customer, making fun of the fact that Plaintiff was an EBT user. (ECF No. 15 ¶ 21.)
>
>    2. Plaintiff felt embarrassed and racially harassed by Davis, and made this fact known to him and Biegel. (ECF No. 15 ¶ 25.) In response, Davis said: "You know what stupid bitch, I fucking work, and I can't even get food stamps." (ECF No. 15 ¶ 26.) Defendant Davis then asked Harris: "What the fuck do you do all day? Nothing, that's how y'all [sic] do is get food stamps." (ECF No. 15 ¶ 27.) Harris, though thoroughly embarrassed, relayed to Davis that she does indeed work, but nonetheless she receives EBT benefits. (ECF No. 15 ¶ 28.) Davis replied: "Yeah we know. Now you got me fucking pissed off bitch." (ECF No. 15 ¶ 29.)
>
>    3. Plaintiff accused Davis of being a racist, and accused Biegel of standing by and allowing his racist tirades. (ECF No. 15 ¶ 33.) Defendant Davis approached Plaintiff and slammed his hands on the check-out counter, pointed his finger to within an inch of Harris' face and screamed: "I am sick of [Plaintiff] using the system, that's all y'all [sic] people do." (ECF No. 15 ¶ 34.)
>
>    5. While away from the register, waiting for the police to arrive, Defendant Davis assisted a white customer with purchases, and acted in a completely professional manner. (ECF No. 15 ¶ 36.) Plaintiff proclaimed: "Damn you treated that white dude real good, oh huh, yeah." (ECF No. 15 ¶ 37.) Defendant Davis turned around to face Plaintiff, laughed at her, and said, "You bet I did." (ECF No. 15 ¶ 38.) Defendant Davis told Plaintiff to "look around, this is a mostly white area." (ECF No. 15 ¶ 39.)

> 6. Biegel came outside and told Plaintiff that "Woody is not a racist" and that "this is a mostly white area." (ECF No. 15 ¶ 43.)

Affording Plaintiff every favorable inference at the motion to dismiss stage, the recurrent use of "y'all" and "y'all people" refers to black individuals when read in context. Similarly, both Davis and Biegel stated to Plaintiff that "this is a mostly white area," suggesting that Plaintiff was out of place at Store 08740 because she is black. Plaintiff has sufficiently alleged racial animus.

Therefore, Defendants' Motion to Dismiss Plaintiff's §§ 1981 and 1982 claims should be denied because Plaintiff has alleged plausible claims for relief.

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendants contend that Plaintiff's claim for intentional infliction of emotional distress must be dismissed because "[u]nder Pennsylvania law allegations of offensive remarks are insufficient to state a claim for intentional infliction of emotion distress." (Defendants' Memorandum in Support of Motion to Dismiss, ECF No. 20 at 11).

In order to make out a claim for intentional infliction of emotional distress ("IIED"), Plaintiff must allege the following regarding the conduct of the moving Defendants: 1) it was extreme and outrageous; 2) intentional or reckless; and 3) it caused severe emotional distress. *Dingle v. Centimark Corp.*, No. CIV.A. 00-6418, 2002 WL 1200944, at *8 (E.D. Pa. June 3, 2002) (citing *Wisniewski v. Johns Manville Corp.*, 812 F.2d 81, 85 (3d Cir. 1987)). The Restatement (Second) of Torts provides guidance as to what constitutes extreme and outrageous conduct:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the

9

> plaintiff to punitive damages for another tort. Liability has been
> found only where the conduct has been so outrageous in character,
> and so extreme in degree, as to go beyond all possible bounds of
> decency, and to be regarded as atrocious, and utterly intolerable in
> a civilized community. Generally, the case is one in which the
> recitation of the facts to an average member of the community
> would arouse his resentment against the actor and lead him to
> exclaim, "Outrageous!"
>
> The liability clearly does not extend to mere insults, indignities,
> threats, annoyances, petty oppressions, or other trivialities. The
> rough edges of our society are still in need of a good deal of filing
> down, and in the meantime plaintiffs must necessarily be expected
> and required to be hardened to a certain amount of rough language,
> and to occasional acts that are definitely inconsiderate and unkind.
> There is no occasion for the law to intervene in every case where
> someone's feelings are hurt.

Restatement (Second) of Torts, § 46, comment d.[2] It is for the court, however, to determine initially whether the conduct in issue can be regarded as so extreme and outrageous as to permit recovery. *Dawson v. Zayre Dep't Stores*, 499 A.2d 648, 649 (Pa. Super. Ct. 1985). But where reasonable minds may differ, it is for the jury to determine whether the conduct is sufficiently extreme and outrageous so as to result in liability. Restatement (Second) of Torts, § 46, comment h.

Finally, a claim for IIED requires competent medical evidence of some physical harm suffered by the plaintiff as a result of defendant's conduct. *Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988 (Pa. 1987); *Reeves v. Middletown Athletic Ass'n*, 866 A.2d 1115, 1122-23 (Pa. Super. Ct. 2004) (citing *Fewell v. Besner*, 664 A.2d 577, 582 (Pa. Super. Ct. 1995)).

Here, the Court recommends that the moving Defendants' Motion to Dismiss Plaintiff's IIED claim be denied at this stage of the proceedings. Plaintiff's averments, taken as true and

---

[2] "Although [§] 46 has not been expressly adopted in Pennsylvania, *see Hoy* [*v. Angelone*,] 720 A.2d [745,] [] 753 n.10 [(Pa. 1998)], it still has provided guidance to our courts when presented with a claim of intentional infliction of emotional distress by outrageous conduct." *Swisher v. Pitz*, 868 A.2d 1228, 1231 n.2 (Pa. Super. Ct. 2005).

drawing all inferences in her favor, may sustain a claim for IIED. These averments describe behavior by Davis (and acquiesced in by Biegel), that was so extreme and outrageous that one of the many customers in the checkout line felt compelled to call police. (ECF No. 15 at ¶ 31.) Plaintiff avers that she informed Davis she was pregnant as he was yelling, slamming his hands on the counter and pointing at her, and that as a result of these events, she began experiencing complications with her pregnancy which required medical attention. (ECF No. 15 at ¶¶ 34, 35, 52, 53.)

Therefore, it is respectfully recommended that moving Defendants' Motion to Dismiss Plaintiff's claim for IIED be denied.

NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Negligent infliction of emotional distress (NIED) is an actionable tort under Pennsylvania law. *Sinn v. Burd*, 404 A.2d 672, 686 (Pa. 1979); *Armstrong v. Paoli Mem'l Hosp.*, 633 A.2d 605, 609 (Pa. Super. Ct. 1993). In order raise a claim for NIED, a plaintiff must demonstrate one of four factual scenarios: (1) where the defendant owed a fiduciary duty toward the plaintiff; (2) where the plaintiff suffered a physical injury that caused the emotional distress; (3) where the plaintiff was in the "zone of danger" of the defendant's tortious conduct; or (4) where the plaintiff witnessed a serious injury to a close family member. *Doe v. Phila. Cmty. Health Alt. AIDS Task Force*, 745 A.2d 25, 27 (Pa Super. Ct. 2000), *aff'd*, 767 A.2d 548 (Pa. 2001).

In general, a plaintiff must prove physical injury to sustain a claim for NIED. *Doe*, 745 A.2d at 28. Physical manifestations cannot be temporary, transitory, or fleeting, but rather severe or recurring. *Armstrong*, 633 A.2d at 609; *Love v. Cramer*, 606 A.2d 1175, 1179 (Pa. Super. Ct. 1992). Moreover, medical evidence is not required in an action claiming NIED. *Krysmalski v.Tarasovich*, 622 A.2d 298, 305 (Pa. Super. Ct. 1993).

11

Here, Plaintiff's arguments in support of her claim for NIED focus on the first theory. (Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, ECF No. 21 at 17.) Specifically, Plaintiff contends that "these Defendants owed [Plaintiff] a 'pre-existing contractual and fiduciary duty' to protect [Plaintiff] against known harms." (Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, ECF No. 21 at 17.) Specifically, Plaintiff must show that Defendants owed a duty of care to Plaintiff, that Defendants breached that duty, Plaintiff suffered an injury as a result of the breach, and Plaintiff suffered an actual loss or damage. *See Toney v. Chester Cnty. Hosp.*, 961 A.2d 192, 198 (Pa. Super. Ct. 2008), *aff'd,* 36 A.3d 83, 84 (Pa. 2011).

Plaintiff's Second Amended Complaint does not contain factual allegations that would give rise to a duty between the parties under Pennsylvania law relating to NIED claims. "In Pennsylvania, the boundaries of this type of NIED claim are currently unsettled." *Arndt v. Wells Fargo Bank, N.A.*, Civil Action No. 14-5586, 2015 WL 2395484, at *5 (E.D. Pa. May 20, 2015) (citing *Hershman v. Muhlenberg Coll.*, 17 F. Supp.3d 454, 458 (E.D. Pa. 2014)). Yet, the Court in *Arndt* described the requirements for an NIED claim invoking the contractual/fiduciary theory as follows:

> In *Toney v. Chester Cnty. Hosp.*, the lead Supreme Court case, the justices were evenly divided. []36 A.3d 83, 84 ([Pa.] 2011). However, those justices who would have recognized a claim offered some guidance in *Toney*, explaining, "NIED is not available in garden-variety 'breach of contractual or fiduciary duty' cases, but only in those cases where there exists a special relationship where it is foreseeable that a breach of the relevant duty would result in emotional harm so extreme that a reasonable person should not be expected to endure the resulting distress." *Id.* The lead justices in *Toney* further clarified that NIED liability derived from a contractual or fiduciary duty should be limited "to preexisting relationships involving duties that obviously and objectively hold the potential of deep emotional harm in the event of breach . . . . [T]he special relationships must encompass an

> implied duty to care for the plaintiff's emotional well-being." *Id.* at [95]. *See Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202, 218-19 (Pa. Super. Ct. 2012) (finding NIED claim legally insufficient because plaintiff failed to establish that defendant hospital owed him a fiduciary duty of care).

*Arndt*, 2015 WL 2395484, at *5 (parallel citation omitted).

Here, even if Plaintiff has sufficiently alleged facts to support an inference of some type of duty, it does not rise to the level of an implied duty of care for her emotional well-being. Instead, the relationship was commercial and eventually, adversarial. Although Plaintiff has alleged physical injury, she has not alleged facts "to support the type of special relationship that might give rise to this incredibly narrow form of NIED liability." *Id.* at *6. *Compare Weiley*, 51 A.3d at 218-19 (finding NIED claim legally insufficient because plaintiff failed to establish that defendant hospital owed him a fiduciary duty of care) *with Toney*, 36 A.3d at 95 (although not all doctor-patient relationships reach the heightened standard, doctors in the field of obstetrics do, given their role in prenatal diagnosis and the implied duty in this particular specialty to care for their patient's emotional wellbeing). Therefore, it is respectfully recommended that Plaintiff's state law NIED claim be dismissed.

## III. CONCLUSION

It is respectfully recommended that the Motion to Dismiss filed by Defendants Dollar General Corporation and Pamela Biegel (ECF No. 19) be granted in part and denied in part. It should be granted as it relates to the PHRA claim and the negligent infliction of emotional distress claim because any attempt to amend these claims would be futile as a matter of law.[3] It should be denied in all other respects.

---

[3] The United States Court of Appeals for the Third Circuit in *Phillips v. County of Allegheny* has ruled that if a district court is dismissing a claim pursuant to Fed. R. Civ. P. 12(b)(6) in a civil

In accordance with the Magistrate Judge's Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Local Rule of Court 72.D.2., the parties are allowed fourteen (14) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

Dated: October 3, 2016        BY THE COURT:

LISA PUPO LENIHAN
United States Magistrate Judge

cc: All counsel of record
Via electronic filing

---

rights case, it must sua sponte "permit a curative amendment unless such an amendment would be inequitable or futile." 515 F.3d 224, 245 (3d Cir. 2008).