# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BEVERLY HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 16-416 |
| | ) | |
| v. | ) | District Judge Nora Barry Fischer |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| DOLGENCORP, LLC, | ) | |
| and PAMELA BIEGEL, | ) | |
| | ) | ECF No. 57 |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

### I.  RECOMMENDATION

It is respectfully recommended that the Motion for Summary Judgment (ECF No. 57) be granted in part and denied in part. It should be granted as it relates to the state law claim of intentional infliction of emotional distress. It should be denied in all other respects.

### II.  REPORT

Presently before the Court is Defendants' Motion for Summary Judgment (ECF No. 57). In addition to its consideration of the parties' written and video submissions, the Court held oral argument on the motion on November 2, 2017.

#### A.  FACTS

The following facts are taken from the parties' Statements of Undisputed Material Facts and Responses thereto at ECF Nos. 58, 64, and 67, and are undisputed unless otherwise indicated.

On March 13, 2016, Plaintiff Beverly Harris ("Plaintiff" or "Harris"), an African American, went shopping at Dollar General store # 8740 in Monroeville, Pennsylvania, located at 4500 Broadway Boulevard (the "Monroeville Store"). She and a friend, Megan McGuiness

("McGuiness"), went to the store together. (ECF Nos. 58 & 64 ¶ 1.) Harris testified that she planned to purchase items from the Dollar General for both herself and McGuiness, and that Harris planned to pay for all the items. Harris and McGuiness put all of their items in a single cart and did not separate Harris's items from McGuiness's. (ECF Nos. 58 & 64 ¶ 2.) Harris put both her and McGuiness's items on the register together. Harris did not tell the cashier that some items were for her and some were for McGuiness. The cashier scanned all of the items that Harris placed on the register area and put the items in bags. (ECF Nos. 58 & 64 ¶ 3.) Harris attempted to pay for the items by swiping her EBT card three (3) times. (ECF Nos. 58 & 64 ¶ 4.) Following Harris's initial attempt to swipe the EBT card, employee Woodrow Davis ("Davis") instructed Harris repeatedly, that she "has to hit food stamps." The Monroeville Store, however, does not accept the food stamp portion of EBT cards. (ECF Nos. 58 & 64 ¶ 5.) Davis knew the store policy regarding EBT. (ECF Nos. 64 ¶ 6; Biegel Dep. at 29:24-30:11; Harris Dep. at 74:1-15.) Therefore, Harris was not able to initially complete her transaction because the Monroeville Store does not accept the form of payment she tried to pay with. The Monroeville Store does accept the "cash part" of EBT. (ECF Nos. 58 & 64 ¶ 5.) Briana Airgood ("Airgood"), the cashier who initially scanned and bagged Harris's items, was a new employee who did not know the store's policy regarding EBT. Airgood went to the back office to ask for help, and Assistant Store Manager Defendant Pamela Biegel ("Biegel") came out to the register area. (ECF Nos. 58 & 64 ¶ 6.)

Biegel explained to Harris that the Monroeville Store did not accept EBT cards for food and pointed out the signs in the store that explained the store's policy. (ECF Nos. 58 & 64 ¶ 7.) Biegel also noted to Davis "you know we don't accept EBT here." (Harris Dep. at 74:1-15.)

Biegel did not inform Harris that she could use the cash option of EBT. (Biegel Dep. at 33:20-34:22.)

An argument ensued between Harris, a customer who was checking out at the other register, and Davis, who was working the other register. (ECF Nos. 58 & 64 ¶ 8.) Harris overheard Davis's remarks to the older, Caucasian customer. Harris described the exchange as follows:

> Once he [Davis] got done instructing me to swipe my food stamp card the additional two times, he turned over to the lady—it was an older, white lady. I want to say she had, like, white hair or something, she was older, and he was like, this is my customer right here, and then he just starts talking about me being on food stamps, me sitting on my A-S-S, me—just all types of crazy stuff.
> I said to him, why are you running my business to her? I said, what's wrong with you? I said, you're crazy, dude. He says—he says to her, this is my customer, and she starts laughing. And I said, what's so funny? And Woody goes, does your EBT card work? And she started laughing even more. So I'm like, oh. I said, you knew it wasn't going to work. I said, you already knew that.
> . . .
>
> He [Davis] said to her, I cannot wait until Donald Trump becomes president. That was the first remark. I said, what? The second thing he said was, that's all y'all do is sit on your A-S-S all day and wait on a check. I said, are you talking to me or are you talking to her? He says, this is—she's my customer; this is my customer, and he just started to slew out all this about him working and he can't get food stamps.
> . . .
>
> That's when he turned around. He was like, you know what, you Fing stupid B? Now you've got me Fing pissed, bitch, and that's when all hell broke loose.
> . . .
>
> And I was like, why are you doing this? Because I'm using a food stamp card? This is over a food stamp card? I was like, you're a fucking racist. I sure did. I called him a racist. And that's when he jumped up and started banging on the counters[.]

> . . .
>
> He went back to waiting on two customers who were white, and I said, oh, you sure as shit treating them white boys good, huh? He says, this is a mostly white area; what'd you expect? And Pamela was there the whole time, didn't say anything, didn't do anything.

(Harris Dep., ECF No. 60-1 at 64-70.) Plaintiff states that a customer approached her to inquire if she was alright, and if she should call the police. Harris responded that the customer could call if she wanted. (ECF No. 64 ¶ 24.) Harris was visibly upset and crying and Biegel testified that she was "maybe a little" afraid when Davis and Harris were arguing. (ECF Nos. 58 & 64 ¶¶ 25-26.)

According to Plaintiff, she accused Davis of being racist, after Davis used extremely derogatory language, as well as the phrase, "y'all people" and then aggressively moved towards Harris and became threateningly violent. (ECF No. 64 ¶ 8.) As the argument progressed, Harris's friend, McGuiness, put some of the bags that were in Harris's cart back on the counter at the register. (ECF Nos. 58 & 64 ¶ 8.) Defendant Biegel began separating the food items from the non-food items, and eventually removed all food items from the counter except for a packet of beef jerky that had already been opened. (ECF Nos. 58 & 64 ¶ 9.) Plaintiff also notes that she did not tell Biegel what items she did or did not want. (ECF Nos. 58 & 64 ¶ 10.)

Plaintiff did not tender a different form of payment for the food items that Biegel had separated, nor did she tell Biegel that she did not wish to purchase the items. Further, Biegel did not tell Harris that she was prohibited from purchasing the separated food items with another form of payment. (ECF Nos. 58 & 64 ¶ 10.) Plaintiff adds that she was upset and frightened due to Davis's behavior, as was Biegel. Plaintiff further notes that Biegel did not inform her that she could use the cash option of EBT. (ECF No. 64 ¶ 10.)

4

Apparently, Biegel voided the initial scans that Airgood made. (ECF Nos. 58 & 64 ¶ 11.) Harris purchased the opened package of beef jerky. (ECF Nos. 58 & 64 ¶ 12.) The parties dispute whether Harris purchased anything else. Defendants contend that Biegel completed Harris's purchase for the non-food items that had not been separated, stating that Harris handed cash to Biegel to pay for the items, wherein Biegel placed the cash in the register, and Harris left the register area with the purchased items in her cart. (ECF No. 58 ¶ 12.) Plaintiff denies that Biegel completed Harris's purchase for the non-food items. Plaintiff contends that her friend McGuiness handed Harris money, which Harris handed to Biegel, but Harris contends that she left the store without any bags. Consequently, it appears that Plaintiff's position is that other than the beef jerky, all items for which Biegel completed the transaction were for McGuiness. (ECF No. 64 ¶ 12.)

The parties agree that after the transaction, Biegel went outside to speak with Harris. (ECF Nos. 58 & 64 ¶ 13.) The parties dispute, however, what happened next. Defendants state that Harris asked for Davis's full name and a telephone number where she could call and complain about her shopping experience, and Biegel provided the information. (ECF No. 58 ¶ 13.) Plaintiff contends that initially, Biegel provided inaccurate information and only provided accurate information when Harris questioned the validity of the information. (ECF No. 64 ¶¶ 13, 35.) Plaintiff does concede, however, that Biegel "was super nice and gave me a hug and apologized for the cashier [Davis]." (ECF Nos. 58 & 64 ¶ 14.) According to Plaintiff, Biegel informed her that Davis was not a racist and repeated what Davis had said about the area being "mostly white." (ECF No. 64 ¶ 36.)

Harris called the number that Biegel gave her and spoke on multiple occasions to the District Manager about her shopping experience. Dollar General terminated Davis's

5

employment because of his role in the argument with Harris. (ECF Nos. 58 & 64 ¶ 15.) Harris was pregnant at the time she visited the Monroeville Store, and contends she later experienced complications with her pregnancy. No doctor or other expert has stated that any of Harris's pregnancy complications were related to her shopping trip to Dollar General. Harris did treat with therapist Melody Janasko related to her experiences alleged in this lawsuit. (ECF Nos. 58 & 64 ¶ 16.)

  B. LEGAL STANDARD

   Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, the pleadings, documents, electronically stored information, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a) & (c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non-movant's burden of proof. *Id.* Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty-*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249-50 (internal citations omitted).

 C. ANALYSIS

  **Liability Under § 1981**

Plaintiff asserts liability against Defendants under 42 U.S.C. § 1981, which provides as follows:

> 1981. Equal rights under the law
>
>  (a) Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c) Protection against impairment
>
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment

under color of State law.

42 U.S.C. § 1981. A claim under §1981 is restricted by its language to discrimination based on race or color. *Springer v. Seaman*, 821 F.2d 871 (1st Cir. 1987) (racial animus is necessary element of claim under § 1981), *abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989). Accordingly, to establish a claim under 42 U.S.C. § 1981, a plaintiff must present evidence that the plaintiff is a member of a racial minority, that there was intent to discriminate on the basis of race by the defendant, and that discrimination concerned one or more of the activities enumerated in the statute. *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993); *Hood v. New Jersey Dep't of Civil Serv.*, 680 F.2d 955, 959 (3d Cir. 1982) (under § 1981, plaintiff must allege facts that would support an inference that defendant intentionally and purposefully discriminated against him).

### **Liability Under § 1982**

Next, Plaintiff asserts liability under § 1982, which establishes the property rights of citizens, and provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. "To establish a cognizable claim under § 1982, a plaintiff 'must allege with specificity facts sufficient to show . . . (1) the defendant's racial animus; (2) intentional discrimination; and (3) that the defendant deprived plaintiff of his [property] rights because of race.'" *Crane v. Cumberland Cnty., Pa.*, 64 F. App'x 838, 841 (3d Cir. 2003) (quoting *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 797 (3d Cir.2001)). "Like § 1981, § 1982 is a Reconstruction statute enacted to effectuate the aims of the Thirteenth and Fourteenth Amendments to the Constitution. Because of the historic interrelationship between the two statutes, courts have consistently construed them together." *Brown*, 250 F.3d at 797

(citing *Tillman v. Wheaton-Haven Recreation Ass'n*, 410 U.S. 431 (1973); *Runyon v. McCrary*, 427 U.S. 160 (1976)).

Defendants argue that they are entitled to judgment as a matter of law because the undisputed material facts demonstrate that Plaintiff was not prevented from purchasing goods because of her race. Plaintiff responds that record evidence reveals several disputed issues of material fact that must be presented to the trier of fact.

Here, the Court agrees that record evidence reveals several disputed issues of material fact, that when viewed in the light most favorable to Plaintiff, could result in a jury verdict for Plaintiff. First, there is a disputed issue of material fact as to whether Plaintiff was prevented in the making or enforcing of her contract with Defendants when Davis told her repeatedly to hit the food stamps option on the pin pad after scanning her EBT card, knowing that her transaction would be repeatedly refused. A reasonable factfinder could conclude that Davis intended to thwart her intended purchase of the items she placed on the check out counter.

Second, there is a disputed issue of material fact as to whether Plaintiff was prevented from making her intended purchases when she was not informed by either Davis or Biegel that the cash portion of her EBT card was accepted at this particular store. Instead, taking the evidence in a light most favorable to the nonmoving Plaintiff, Biegel began removing items from the checkout counter without consulting with Plaintiff. And relatedly, Plaintiff disputes Biegel's testimony that Plaintiff told Biegel that she no longer wished to purchase the remainder of items segregated and placed in front of Register 1. A reasonable jury could find from these facts that Defendants prevented Plaintiff's intended purchase.

In addition, when Davis confronted Plaintiff at Register 1, slamming his hands and screaming at Plaintiff, record evidence indicates that not only did Davis upset Plaintiff, but he

frightened Biegel as well. A reasonable jury could return a verdict in favor of Plaintiff if they conclude that Davis's behavior was so extreme that Plaintiff and/or Biegel were intimidated to the point where they were prevented from completing the intended transaction. In fact, record evidence reflects that Biegel, the assistant store manager, did nothing to intervene. All of the above reflect a series of actions which a trier of fact could find as a whole thwarted Plaintiff's attempt to make and close a contract with Defendants.[1]

Finally, taking the facts in the light most favorable to Plaintiff, record evidence reflects genuine issues of fact as to whether the alleged refusal of Defendants to contract with Plaintiff was motivated by race. When Davis instructed Plaintiff repeatedly to hit the food stamps option on the pin pad, he began ridiculing Plaintiff for being an EBT user. Some of his comments were directed to a white customer in his line at Register 2, who participated with Davis in ridiculing Plaintiff for being an EBT user. Davis referred to this white customer as "his" customer and when Plaintiff commented on how well Davis treated his white customers, Davis responded: "this is a mostly white area; what'd you expect?" Record evidence also reflects that Davis became enraged and referred to "y'all people" that sit around all day and wait on a check. Thereafter, when Biegel went outside to speak with Plaintiff, Biegel informed her that Davis was not a racist and repeated what Davis had said about the area being "mostly white." A reasonable factfinder could conclude that these comments by Biegel and Davis evidence that their behavior was motivated by Plaintiff's race.

Therefore, it is respectfully recommended that Defendants' Motion for Summary Judgment on Plaintiff's claims pursuant to 42 U.S.C. §§ 1981 and 1982 should be denied.

---

[1] As noted in the fact section, the parties dispute whether Plaintiff purchased any of the items she presented at the checkout counter other than the beef jerky.

**Intentional Infliction of Emotional Distress**

Defendants argue that they are entitled to judgment as a matter of law on Plaintiff's intentional infliction of emotional distress ("IIED") claim because there is no competent medical evidence of a causally connected physical injury or extreme and outrageous conduct. Plaintiff responds that she can rely on testimony from Plaintiff's therapist, Ms. Janasko, and even in the absence thereof, recent Pennsylvania Supreme Court precedent establishes that expert medical testimony is unnecessary where the causal connection between the conduct and the injury is direct and obvious to laypersons, citing *Montgomery v. Bazaz-Sehgal*, 798 A.2d 742, 751-52 (Pa. 2002).

In order to establish a claim for IIED under Pennsylvania law, a plaintiff must demonstrate that a defendant's conduct was extreme and outrageous, that it caused the plaintiff severe emotional distress, and that the defendant acted with the intent to cause that distress or with knowledge that such distress was substantially certain to occur. *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 217 (3d Cir. 2001). An IIED claim will only survive where "'the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Reedy v. Evanson,* 615 F.3d 197, 231-32 (3d Cir. 2010) (quoting *Field v. Phila. Elec. Co.*, 565 A.2d 1170, 1184 (Pa. Super. Ct. 1989)). Plaintiff must has suffered "'some type of resulting physical harm due to the defendant's outrageous conduct,'" which must be supported by competent medical evidence. *Reedy*, 615 F.3d at 231 (quoting *Field*, 565 A.2d at 1184).

*Montgomery* involved an IIED claim stemming from Plaintiff's unwanted and unexpected implantation of a penile prosthesis. *Montgomery*, 798 A.2d at 752. The causal

connection here between Defendants' conduct and Plaintiff's alleged mental distress is not nearly as obvious as the mental distress suffered by the plaintiff in *Montgomery*. Consequently, the exception to the competent medical evidence requirement articulated in *Montgomery* is inapplicable here. Relatedly, as to Ms. Janasko, the summary judgment record reflects only that Plaintiff counseled with her. It does not reflect competent medical evidence that the mental distress allegedly suffered by Plaintiff was caused by Defendants' conduct. Consequently, Plaintiff has failed to come forward with evidence showing that there is a genuine issue for trial as to her IIED claim.[2] Therefore, the Court respectfully recommends that Defendants' Motion for Summary Judgment on Plaintiff's IIED claim be granted.

   D.   CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Motion for Summary Judgment (ECF No. 57) be granted in part and denied in part. It should be granted as it relates to the state law claim of intentional infliction of emotional distress. It should be denied in all other respects.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

---

[2] Plaintiff is correct that she may still recover damages for injury in the form of emotional distress in the absence of expert medical evidence pursuant to the civil rights laws. *See Bolden v. S.E. Pa. Transp. Auth.*, 21 F.3d 29, 35-36 (3d Cir. 1994) ("In light of the purpose of the civil rights laws we have described, we see no reason to require that a specific type of evidence be introduced to demonstrate injury in the form of emotional distress.")

Dated: December 4, 2017

                                      BY THE COURT

                                      <u>s/Lisa Pupo Lenihan</u>
                                      LISA PUPO LENIHAN
                                      United States Magistrate Judge

cc:    All counsel of record
       Via electronic filing